**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| LDK SOLAR SYSTEMS, INC., <u>et al.</u>,[1] | Case No. 14-<u>12384</u> (___) |
| Debtors. | Joint Administration Requested |

<u>**DECLARATION OF JACK KUN-SHEN LAI  IN SUPPORT OF FIRST DAY MOTIONS**</u>

   I, Jack Kun-Shen Lai, being duly sworn, state the following under penalty of

perjury:

   1.  I am the President, Treasurer and Secretary of LDK Solar Systems, Inc.

("<u>LDK Solar Systems</u>"), the Chief Financial Officer and Secretary of LDK Solar USA, Inc.

("<u>LDK Solar USA</u>") and the Chief Executive Officer, Chief Financial Officer and Secretary of

LDK Solar Tech USA, Inc. ("<u>LDK Solar Tech</u>"), the debtors and debtors in possession

(collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (these "<u>Chapter 11</u>

<u>Cases</u>").[2]  In addition, I serve as a Director of each of the Debtors and am the Chief Financial

Officer of LDK Solar CO., Ltd. (in provisional liquidation) ("<u>LDK Parent</u>"), a company

organized under the laws of the Cayman Islands and the ultimate parent of each of the Debtors.  I

am generally familiar with the Debtors' day-to-day operations, business affairs and books and

records.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  LDK Solar Systems, Inc. (2944); LDK Solar USA, Inc. (0488); and LDK Solar Tech USA, Inc. (3978).  The mailing address for each Debtor is 1290 Oakmead Parkway, Suite 306, Sunnyvale, California 94805.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion, the Disclosure Statement or the Plan (each as defined herein), as applicable.

2.      On October 21, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3.      To enable the Debtors to minimize the adverse effects of the commencement of the Chapter 11 Cases on their business operations, the Debtors have requested various types of relief in certain first day motions (each a "First Day Motion" and, collectively, the "First Day Motions").  The First Day Motions seek relief aimed to, among other goals, (a) ensure the continuation of the Debtors' cash management procedures and other business operations; (b) establish certain administrative procedures to facilitate a smooth transition into, and uninterrupted operations throughout, the chapter 11 process; and (c) maintain employee morale.  The achievement of these goals will be critical to the success of these Chapter 11 Cases and the Debtors' reorganization efforts.

4.      I submit this declaration (the "Declaration") in support of the First Day Motions.  I am familiar with the contents of each First Day Motion (including the exhibits attached thereto) and believe that the relief sought (i) is necessary to preserve the value and productivity of the Debtors' operations, (ii) is integral to the successful reorganization of the Debtors and (iii) serves the best interests of the Debtors' estates, their creditors and other parties in interest.

5.      Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, materials provided by members of the Debtors' management team, information provided by professionals retained by the Debtors, or information obtained from my review of relevant documents.  Additionally, the opinions asserted in this Declaration are based upon my experience and knowledge of the Debtors' operations, financial condition and

01:16164366.1

liquidity.  If called upon to testify, I would competently testify to the facts set forth herein.  I am authorized to submit this Declaration on behalf of each of the Debtors.

6.    Part I of this Declaration provides a brief overview of the Debtors' operations, the circumstances leading to LDK Parent's global restructuring and the commencement of these Chapter 11 Cases.  Part II sets forth the relevant facts in support of each of the First Day Motions.

7.    For a further description of the Debtors' historical business operations and events leading to these Chapter 11 Cases, please refer to (a) the *Declaration of  Tammy Fu in Support of Chapter 11 Petitions* (the "JPL Declaration"), and (b) the *Disclosure Statement in Connection with the Joint Prepackaged Plan of Reorganization for LDK Solar Systems, Inc., LDK Solar USA, Inc. and LDK Solar Tech USA, Inc.*, dated as of September 17, 2014 (the "Disclosure Statement").

## PART I

### A.    Overview of the Debtors' Business Operations

8.    LDK Parent is the ultimate parent of the LDK Solar group of companies (the "Group"), which includes a large number of intermediate holding and operating companies in the People's Republic of China (the "PRC"), Hong Kong, Europe and North America.  The business of the Group is to manufacture and sell a variety of photovoltaic ("PV") products used in the production of solar-generated electrical power.  Specifically, the Group produces polysilicon, mono- and multicrystalline ingots, wafers, cells, modules, systems, power projects and solutions, which, in turn, facilitate the production of solar panels by the Group and other down-stream customers.  As of September 30, 2014, the Group had 8,381 employees.

01:16164366.1

9.     Headquartered in Sunnyvale, California, LDK Solar USA is the direct parent of LDK Solar Tech and holds an 80% ownership stake in LDK Solar Systems.[3]  LDK Solar USA's business activities include supervision, administration, finance and human resources functions for the Debtors and certain non-debtor affiliates in connection with the Group's United States operations.  Historically, LDK Solar Tech was the only operating Debtor, with its main business being the sales and marketing of the Group's solar panels in North American markets.  Due to certain external factors, including certain anti-dumping and duty policies of the United States Department of Commerce, LDK Solar Tech's business contracted significantly, and LDK Solar Tech eventually ceased operations.  As a result, the last employee of LDK Solar Tech left the company in April 2014, and LDK Solar Tech is not currently operating.

10.     Because the Debtors' operations consist of various supervisory and administrative functions in connection with the Group's United States operations, the Debtors do not generate any direct income from third parties.  Rather, the Debtors' sole source of revenue is monthly service payments from LDK Solar International Co., Ltd. ("LDK International"), a subsidiary of LDK Parent that serves as the primary treasury function between the Group's operations in the PRC (the "Onshore Operations") and the Group's operations outside of the PRC, in Asia, Europe and the United States (the "Offshore Operations").  These monthly service payments consist of the monthly costs associated with the Debtors providing the Group with services in the United States, including employee-associated costs, plus an additional fee of approximately 5%.

---

[3] LDK Parent and LDK Silicon & Chemical Technology Co., Ltd. together own the remaining 20% of LDK Solar Systems, Inc.

**B.**     **Circumstances Leading to the Global Restructuring and the Cayman Proceeding**

11.     It is my understanding that, over the past several years, the solar power industry encountered significant financial challenges as a result of, among other things, a reduction in the price of solar panels and the declining price of polysilicon, a key raw material used to manufacture polycrystalline panels.  Specifically, since 2011, the Group has been significantly impacted by over-capacity and over-supply in the global PV market.  In 2012, the Group suspended its polysilicon production due to significant operating losses, and the Group's PV products faced decreased market demand and depressed prices.  Similarly, due to the ongoing deteriorating PV market condition and overall global economic slowdown, the Group also encountered challenges in manufacturing and selling solar wafers.

12.     The impact of the over-supply of PV products and the scaling back of subsidies in various European markets had a material adverse impact on the Group's operational performance and resulted in the deterioration of the Group's financial performance.  In response to these adverse market conditions, the Group was forced to reduce production and, in some instances, suspend the operations of certain plants.

13.     In response to the Group's deteriorating financial condition, LDK Parent retained certain advisors in September 2013 in connection with a potential restructuring of the Group's outstanding debt, including (i) Jefferies LLC ("Jefferies") as the Group's financial advisor, (ii) Sidley Austin LLP ("Sidley") as global legal advisor, and (iii) the Campbells firm ("Campbells") as Cayman Islands legal advisor.

14.     In August 2013, LDK Parent postponed the payment of interest due and payable to the holders of Senior Notes so that LDK Parent could evaluate and determine the most appropriate course of action.  As a result, LDK Parent, along with its advisors, approached a number of significant holders of Senior Notes (as defined below) (the "Ad Hoc Committee")

with respect to the repayment of the Senior Notes.  Thereafter, in September 2013, LDK Parent entered into a standstill agreement with holders of Senior Notes in the Ad Hoc Committee (the "Consenting Noteholders") whereby those holders agreed to, among other things, postpone any enforcement actions available to them under the Senior Note Indenture in the event of a default. This standstill agreement was extended on a rolling basis until February 27, 2014.

15.     In order to have sufficient time to negotiate the terms of a restructuring support agreement without risk of a dissident holder of the Senior Notes commencing any adverse action against LDK Parent, LDK Parent filed an application with the Grand Court of the Cayman Islands, Financial Services Division (the "Cayman Court") on February 21, 2014 seeking orders from the Cayman Court for the appointment of joint provisional liquidators of LDK Parent (the "Cayman Proceeding").

16.     On February 27, 2014, the Cayman Court appointed Eleanor Fisher and Tammy Fu, both partners of Zolfo Cooper (Cayman) Limited, as the Joint Provisional Liquidators of LDK Parent (the "JPLs").  The order appointing the JPLs (the "Cayman Order") provided that the JPLs are jointly and severally authorized to exercise substantial authority and control over LDK Parent's operations and, pursuant to the order, the powers of the Board have largely been displaced by the JPLs.[4]  As a result, since the appointment of the JPLs, LDK Parent's management and operations have been conducted primarily from the Cayman Islands by the JPLs.

**C.     Summary of Debtors' Prepetition Indebtedness**

17.     As subsidiaries of LDK Parent, certain of the Debtors, from time to time, have incurred obligations in furtherance of the Group's global operations.

---

[4] It is my understanding that, pursuant to the Cayman Order, the powers of LDK Parent's directors were suspended except for the residual power to instruct attorney to appear on behalf of LDK Parent at certain proceedings before the Cayman Court.

18.   <u>The Senior Notes</u>.   On February 28, 2011, LDK Parent announced the closing of the offering of its US$-settled 10% senior notes due 2014 in the aggregate principal amount of RMB 1.2 billion (the "<u>Senior Notes</u>").   The Senior Notes were issued pursuant to that certain Indenture dated as of February 28, 2011 (as amended, supplemented or otherwise modified from time to time) by and among LDK Parent and certain of its subsidiaries as guarantors, The Bank of New York Mellon, London Branch, as trustee and paying and transfer agent, and The Bank of New York Mellon (Luxembourg) S.A., as registrar.   As noted, the Senior Notes were guaranteed on a joint and several basis by certain of LDK Parent's subsidiaries, including, without limitation, two of the Debtors, LDK Solar USA and LDK Solar Tech.   These guarantees are unsecured.   The final maturity of the Senior Notes occurred on February 28, 2014, when the amount of RMB 1,794,760,000 (approximately US $295,677,100) became due.

19.   <u>SPI Acquisition Financing</u>.   On March 28, 2011, LDK Parent, the parent of Debtor LDK Solar USA, entered into a US $23 million Facility Agreement (the "<u>SPI Facility Agreement</u>") with China Development Bank Corporation.   The proceeds of the SPI Facility Agreement were further loaned by LDK Parent to LDK Solar USA via an intercompany note to finance LDK Solar USA's acquisition of shares in non-debtor Solar Power, Inc. ("<u>SPI</u>").   In connection with the SPI Facility Agreement, on March 28, 2011, LDK Solar USA and China Development Bank Corporation entered into a Share Pledge Agreement pursuant to which LDK Solar USA pledged, among other things, its shares of SPI, which pledge was a condition precedent to the making of the loan to LDK Parent, and was in consideration for LDK Parent being authorized to loan the proceeds to LDK Solar USA.   The Share Pledge Agreement provides that the pledge is non-recourse and that China Development Bank Corporation's sole

recourse in the event that an obligor defaults on its obligations under the SPI Facility Agreement is the collateral pledged under the Share Pledge Agreement.

20.    <u>North Palm Springs Share Pledge</u>.  On December 30, 2011, LDK Parent, the parent of LDK Solar USA, entered into (a) a US $7,000,000 facility agreement in connection with the financing for an electricity grid-connected PV, solar power generation plant with installed capacity of 2.83MW, and (b) a US $6,800,000 and an RMB 35,000,000 facility agreement for an electricity grid-connected PV, solar power generation plant with installed capacity of 4.96MW (together, the "<u>NPS Facility Agreements</u>"), both with China Development Bank Corporation.  Furthermore, in connection with the NPS Facility Agreements, on December 30, 2011, LDK Solar USA and China Development Bank Corporation entered into a Share Pledge Agreement pursuant to which LDK Solar USA pledged, among other things, its 100 % LLC membership interests in North Palm Springs Investments, LLC, which pledge was a condition precedent to the making of the loan to LDK Parent.  The Share Pledge Agreement provides that the pledge is non-recourse and that China Development Bank Corporation's sole recourse in the event that an obligor defaults on its obligations in connection with the NPS Facility Agreements is the collateral pledged under the Share Pledge Agreement.

21.    <u>Munich Re Action</u>.  On May 1, 2012, Great Lakes Reinsurance (UK) plc and Munich Reinsurance Company (together, the "<u>Munich Re Companies</u>") commenced an action entitled *Great Lakes Reinsurance (UK) plc and Munich Reinsurance Company, v. LDK Solar CO., Ltd.; LDK Solar Europe Holding, S.A. and LDK Solar USA, Inc.* in the Santa Clara County Superior Court (Case No. 112-CV-223439) against LDK Parent, LDK Solar USA and LDK Solar Europe Holding S.A. ("<u>LDK Solar Europe</u>" and, together with LDK Parent and LDK Solar USA, the "<u>Munich Re Defendants</u>") to, among other things, recover alleged damages for

an adjusted annual premium that LDK Solar Europe was purportedly required to pay to Great

Lakes Reinsurance (UK) plc under a policy of insurance covering the performance warranty of

certain PV modules that the Munich Re Defendants manufactured and sold in January 2010.

22.     On July 31, 2012, the Munich Re Companies obtained a judgment from

the Superior Court of the State of California against the Munich Re Defendants (the "Stipulated

Judgment").  Pursuant to the Stipulated Judgment, the Munich Re Defendants were liable, on a

joint and several basis, to pay US $13,288,024.52 (the "Judgment Debt"), to the Munich Re

Companies.  The Munich Re Companies were also entitled to recover post-judgment interest at

the legal rate of 10% per annum from the date of the Stipulated Judgment.

23.     On December 11, 2012, LDK Solar Europe made a US $1.2 million

payment to Munich Reinsurance Company.  On March 26, 2014, the JPLs received a proof of

debt from the Munich Re Companies against LDK Parent in the amount of US $13,096,748.

24.     The JPLs have engaged in extensive negotiations with the Munich Re

Companies.  Following the JPLs' negotiations, the Munich Re Companies, Jiangxi LDK Solar

and the Munich Re Defendants entered into a settlement agreement and escrow agreement with

respect to the Stipulated Judgment (the "Munich Re Settlement").  Specifically, in exchange for a

release from liability on account of the Stipulated Judgment, LDK Parent will (a) pay US $1

million in cash into escrow to be held on deposit and released to Munich Reinsurance Company

on the effective date of the Cayman Scheme (as defined below) and (b) will issue and allot

756,620 of LDK Parent's ADSs representing ordinary shares with a notional value of US $1.2

million 7 days after the effective date of the Cayman Scheme.  The Munich Re Defendants and

Jiangxi LDK Solar have also, among other things, agreed not at any time to institute, or join in or

cooperate with any third-party in any claim or legal proceeding of any kind and in any

jurisdiction against any of the Munich Re Companies directly or indirectly relating to, arising out

of or in respect of the policy of insurance and related documents.  The Munich Re Settlement is

conditioned upon the occurrence of the effective date of the Cayman Scheme.

25.      In addition, as of the Petition Date, the Debtors have, among other things,

numerous intercompany obligations and other various unsecured liabilities.

26.      A brief overview of the obligations of each Debtor follows:

a)      LDK Solar Systems

| Description of Obligation | Approximate Amount Outstanding (US$) |
|---|---|
| Intercompany payable due to LDK Solar CO., Ltd. | $900,000 |
| Intercompany payable due to LDK Solar USA | $9,000 |
| **TOTAL** | **$909,000** |

b)      LDK Solar USA

| Description of Obligation | Approximate Amount Outstanding (US$) |
|---|---|
| Guarantor indebtedness in connection with the Senior Notes | $285 million |
| Intercompany payables due to non-Debtor affiliates | $26.7 million |
| Contingent, non-recourse obligations under the SPI Facility Agreement | $11 million |
| Contingent, non-recourse obligations under the NPS Facility Agreements | $17.9 million |
| Munich Re judgment amount | $14.4 million |
| Other miscellaneous liabilities (deferred rent and automobile financing) | $31,000 |
| **TOTAL** | **$355.03 million** |

c)      LDK Solar Tech USA

| Description of Obligation | Approximate Amount Outstanding (US$) |
|---|---|
| Guarantor indebtedness in connection with the Senior Notes | $285 million |
| Intercompany payables due to non-Debtor and Debtor affiliates | $2.3 million |
| **TOTAL** | **$287.3 million** |

## PART II

27.      Concurrently with the filing of these Chapter 11 Cases, the Debtors have

filed several First Day Motions, consisting of an administrative motion and motions relating to

the Debtors' business operations.  The Debtors believe that approval of each First Day Motion is

an important element of their reorganization efforts and is necessary to ensure a smooth

transition into chapter 11 with minimal disruption to their operations.  I have reviewed each of

the First Day Motions, including the exhibits thereto, and believe that the relief requested therein

is critical to the Debtors' ability to achieve a successful reorganization.  Factual information with

respect to each First Day Motion is provided below and in each First Day Motion.

A. ***Motion of the Debtors For an Order (I) Authorizing Continued Use of Prepetition Bank Accounts, (II) Authorizing Continued Use of Existing Business Forms, (III) Waiving the Requirements of § 11 U.S.C. § 345(b), (IV) Granting Administrative Expense Status to Certain Postpetition Intercompany Claims, and (IV) Authorizing the Debtors to Continue to Settle Certain Intercompany Claims in Accordance With Prepetition Practices*** (the "<u>**Bank Accounts Motion**</u>")

28.    In the ordinary course of business, the Debtors use a series of bank

accounts to collect funds from their operations and to pay operating and administrative expenses

(the "<u>Bank Accounts</u>").  A full list of the Debtors' Bank Accounts is attached to the Bank

Accounts Motion as <u>Exhibit B</u>.[5]  The Debtors utilize their Bank Accounts in a manner similar to

those utilized by other companies to collect, concentrate, and disburse funds in a cost-effective

and efficient manner.  A diagram outlining the general movement of funds inside and outside of

the Debtors' Bank Accounts on a day-to-day basis is attached to the Bank Accounts Motion as

<u>Exhibit C</u>.

29.    The Debtors' Bank Accounts are carefully managed through oversight

procedures implemented by the Debtors' financial personnel located at the Debtors' facility in

California, with the input and cooperation of the personnel of LDK Parent and other affiliates of

the Group.  As illustrated in the Exhibits attached to the Bank Accounts Motion and as discussed

---

[5] LDK Solar USA maintains three (3) Bank Accounts at CTBC Bank and one (1) Bank Account at Citibank; LDK Solar Tech maintains three (3) Bank Accounts at Cathay Bank; and  LDK Solar Systems maintains one (1) bank account at Citibank.

in greater detail below, the Bank Accounts are maintained at Chinatrust Bank USA ("CTBC Bank"), Cathay Bank, a California state-chartered commercial bank ("Cathay Bank") and Citibank, N.A. ("Citibank", and, together with CTBC Bank and Cathay Bank, the "Banks"). Although the Debtors do not currently have revenue-generating operations of their own, the Debtors receive monthly service payments (the "LDK Solar Service Payments") from LDK International in connection with the Group services provided by the Debtors in the U.S. in support of the Group's Off-Shore Operations. The LDK Solar Service Payments received from LDK International cover the monthly expenses of the Debtor, including employee-associated costs, plus an additional fee of approximately 5%. The monthly service payments the Debtors receive from LDK International average approximately US $105,000 per month.

30.     Generally, the funds received from LDK International are concentrated into a Bank Account maintained by LDK Solar USA at CTBC Bank (the "Primary Checking Account"). Payroll for the Employees of the Debtor is processed through a Bank Account maintained at CTBC Bank by LDK Solar USA (the "Payroll Account"). The Debtors' Employees are paid twice per month, and all Employees are paid via direct deposit payments.[6] Debtor LDK Solar USA also maintains a savings account,[7] where the Debtors regularly deposit excess funds in order to utilize the saving account's interest rate.

***Continuing Use of the Debtors' Bank Accounts Is in the Best Interests of the Debtors' Estates and Creditors***

31.     The Debtors seek authority to continue utilizing their Bank Accounts, as

---

[6] With respect to payroll payments that are issued via direct deposit, the Debtors generate a direct deposit file and transmit ACH debit instructions to CTBC Bank each payroll period. The Debtors also fund the Payroll Account three (3) business days before the applicable pay date with funds that are transferred from the Primary Checking Account. Debits are made against the Payroll Account on the fifteenth day and last day of every month when funds are transferred to the Employees' designated personal account. If the fifteenth or last day of the month falls on a weekend, the actual date of payment to Employees is the last business day prior to the designated payment date.
[7] The savings account has a current interest rate of 0.2499%, and had a balance of approximately $50,000 as of the Petition Date.

01:16164366.1

described above, on a postpetition basis.  The Debtors utilize their Bank Accounts in an organized fashion in order to collect, concentrate, and disburse funds as needed in the Debtors' business operations in an efficient manner.  The Bank Accounts provide significant benefits to the Debtors, including the ability to: (a) track closely, and thus control, all corporate funds and amount of all funds, (b) ensure cash availability, and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information.

32.     I believe that, absent the relief requested, the Debtors' business would experience significant disruption, thus impeding the Debtors' ability to carry out their normal business operations to the detriment of the employees and the non-debtors they provide services to on behalf of the Group.  Furthermore, disrupting the use of the Bank Accounts would impair the Debtors' ability to transition smoothly and quickly into and out of these Chapter 11 Cases as contemplated by the Plan.  Therefore, I believe that the Debtors should be permitted to continue to maintain their existing Bank Accounts and, if necessary, to open new accounts and close existing accounts in the normal course of business operations.

33.     Maintaining the Debtors' Bank Accounts will also facilitate the ongoing operations of the Debtors' businesses in an efficient manner.  The Bank Accounts allow the Debtors to ensure Employees are paid on-time, guard against fraud and to protect the integrity of the overall system.  Any changes to the Debtors' Bank Accounts or their systems that report on account activity would undermine the safe and effective system presently employed by the Debtors.

34.     Therefore, I believe it is both essential and in the best interests of the Debtors' respective estates and creditors that the Debtors' Bank Accounts be maintained.

Accordingly, the Debtors respectfully request that the Court authorize their continued use of the Bank Accounts.

### *Request that the Court Grant Administrative Expense Status to Certain Postpetition Intercompany Claims*

35.    In the normal course of their business operations, the Debtors and their affiliates engage in routine business relationships with each other (the "Intercompany Transactions") resulting in intercompany receivables and payables (the "Intercompany Claims"). Accordingly, at any given time there may be Intercompany Claims owing by one Debtor to another affiliate or by one affiliate to a Debtor.  The Intercompany Claims are reflected as journal entry receivables and payables, as applicable, in the respective Debtors' accounting systems. [8]  The Debtors track all fund transfers electronically in their accounting system and can ascertain, trace and account for Intercompany Transactions.

36.    I believe that according administrative expense status to Intercompany Transactions between or among a Debtor and another Debtor is in the best interests of the Debtors' respective estates in that such relief will ensure that each Debtor receiving payments from another Debtor will continue to bear ultimate repayment responsibility for such ordinary course transactions.

---

[8] For the avoidance of doubt, Intercompany Transactions do not include the LDK Solar Service Payments. The LDK Solar Service Payments are recorded as revenue in the Debtors' books, and a corresponding debit is made to a standing receivable from LDK International.  The LDK Solar Service Payments are paid to the Debtors on account of Group services provided in the U.S., and, as a result, are not considered to be loans provided by LDK Parent and/or LDK International.

01:16164366.1

**B.  *Motion of the Debtors for an Order (I) Authorizing the Debtors to Pay Certain Prepetition Employee Obligations, (II) Authorizing the Debtors to Reimburse Business Expenses, (III) Authorizing The Debtors To Maintain And Continue Employee Benefits And Programs In Their Ordinary Course, (IV) Authorizing And Directing Applicable Banks To Honor All Checks And Transfers Drawn On The Debtors' Accounts, And (V) Granting Related Relief* (the "<u>Wages Motion</u>")***

37.    Prior to the significant decline in the Debtors' business and operations described above and in the Disclosure Statement, the Debtors maintained a sophisticated and elaborate compensation and benefits system for its many employees.  However, as of the Petition Date, there are only four (4) individuals remaining that are compensated by the Debtors and participate in the Debtors' benefit plans (the "<u>Employees</u>"), which are described in further detail below and the Wages Motion.[9]  Two of the Employees are directly employed by the Debtors and only provide services to other affiliates within the Group structure as is required in their capacities as Debtor Employees performing services in connection with the Group's Offshore Operations (defined below).  The remaining two individuals have employment agreements with LDK Parent and provide services to both LDK Parent and the Debtors in connection with the Debtors' role in the Group's Offshore Operations.  However, pursuant to the terms of such individuals' employment agreements, they are paid by LDK Solar USA and entitled to participate in the Debtors' benefit programs described in the Wages Motion.

38.    Given the small number of Employees overseeing the operations of the Debtors, each of the Employees provide a variety of critical functions for the Debtors, including providing management services, administrative, accounting, supervisory and other management functions in support of the Company's Offshore Operations in the United States.  The Employees' skills, knowledge, and understanding of the Debtors' businesses are one of the

---

[9] In addition, Mr. Xingxue Tong was appointed as CEO of Debtor LDK Solar USA on September 2, 2014.  As of the Petition Date, Mr. Tong has an employment agreement with LDK Parent, and LDK Parent provides all salary and benefits to Mr. Tong.  As a result, the terms of Mr. Tong's employment are not subject to the Wages Motion.

Debtors' most valuable assets.  Without the continued services of the Employees, an effective

reorganization of the Debtors will not be possible.

39.      Despite the decrease in the number of Employees, the Debtors, in an effort

to maintain normal business operations and provide flexibility in the event that the Debtors

increase business operations following the Chapter 11 Cases, have maintained their longstanding

compensation and benefit structures.  To minimize the personal hardship that the Employees

would suffer if prepetition employee-related obligations are not paid when due or as expected, as

well as to maintain morale of these essential Employees during this critical time, the Debtors, by

the Wages Motion, seek authority, in accordance with their stated policies and normal operating

procedures, to: (a) pay all prepetition wages, salaries, commissions, and other compensation

owed to the Debtors' Employees, subject to the Cap; (b) reimburse all prepetition business

expenses to Employees; (c) make all payments for which prepetition payroll and tax deductions

were made; (d) honor prepetition obligations under certain employee benefit programs, and

continue such programs in the ordinary course; and (e) make all payments to third parties

relating to the foregoing payments and contributions.  The Debtors further seek an order

authorizing and directing applicable banks and other financial institutions to honor and pay all

checks and transfers drawn on the Debtors' payroll accounts to make the foregoing payments

(collectively, and as more fully described below, the "Employee Wages and Benefits").  In

addition, the Debtors request the right to modify, change and discontinue any of the Employee

Wages and Benefits, and the policies related to Reimbursable Expenses, and to implement new

Employee Wages and Benefits programs in the ordinary course of business during these Chapter

11 Cases in their sole discretion without the need for further Court approval.

01:16164366.1

40.     The Debtors seek the relief requested in the Wages Motion because any delay in paying any of the Employee-related wages, deductions, reimbursements and benefits described in the Wages Motion, could severely disrupt the Debtors' relationships with their Employees and irreparably impair the Employees' morale at the very time that their dedication, confidence, and cooperation are most critical.  The Debtors have commenced these Chapter 11 Cases in order to effect a brief, consensual restructuring of their long-term indebtedness with no impairment to holders of unsecured claims and minimal disruption to the Debtors' day-to-day business operations as part of the Group's overall global restructuring.  The Debtors simply cannot risk the substantial disruption of their business operations that would attend any decline in workforce morale attributable to the Debtors' failure to pay the Employee Wages and Benefits in the ordinary course of their businesses.

41.     If the relief requested in the Wages Motion is not granted, I believe that the Employees would suffer hardship and, in many instances, financial difficulties, since these monies are needed to enable them to meet their personal obligations.  In addition, without the requested relief, the Debtors' stability would be undermined by the potential threat that otherwise loyal Employees would seek other employment, negatively affecting the Debtors' consensual restructuring process.

42.     I believe that the Employees are essential to the orderly and successful reorganization of the Debtors.  The Debtors' Employees rely exclusively on their full compensation or reimbursement of their expenses (as applicable) in order to continue to pay their daily living expenses, and these individuals will be exposed to significant financial difficulties if the Debtors are not permitted to pay the unpaid Employee Wages and Benefits.  Any delay or failure to pay wages, salaries, benefits and other similar items would irreparably impair the

Employees' morale, dedication, confidence, and cooperation, and would adversely impact the

Debtors' relationship with the Employees at a time when the Employees' support is critical.

43.    The checks issued to Employees on account of Employee Wages and

Benefits are drawn on an identifiable bank account.  The Debtors believe that they have

sufficient cash reserves to promptly pay all of the Employee Wages and Benefits, to the extent

described in the Wage Motion, on an ongoing basis and in the ordinary course of their

businesses.

### Prepetition Employee Obligations

44.    The Debtors' obligations for Wages, Reimbursable Expenses, Payroll

Taxes and Deductions are described below:

a.    ***Wages.***  The Debtors' average gross monthly expenditure for their
Employees' wages and salaries is approximately US $65,000 ("Wages").
The payroll payments are made by direct deposit through electronic
transfer of funds directly to the Employees, and each of the Employees is
paid by LDK Solar USA.[10]  As of the Petition Date, the aggregate amount
of accrued wages, salaries, commissions and other compensation
(excluding the Payroll Taxes and Deductions (each as defined below))
earned prior to the Petition Date that remains unpaid to the Debtors'
Employees is approximately US $3,880 (the "Unpaid Wages").[11]

b.    ***Reimbursement of Prepetition Employee Business Expenses.***  Prior to the
Petition Date, and in the ordinary course of their businesses, the Debtors
directly or indirectly reimbursed Employees for certain expenses incurred
on behalf of the Debtors in the scope of their employment (the
"Reimbursable Expenses").  The Reimbursable Expenses are expenses for
ground transportation, air travel, lodging, meals, and other business-

---

[10] The Employees are paid on a semi-monthly basis (the "Pay Date"). Wages are handled with the assistance of a
third-party payroll processer, ADP, LLC ("ADP").  The Debtors process payroll primarily through one (1) master
payroll account (the "Payroll Account") located at Chinatrust Bank USA ("CTBC Bank"). Typically, the payroll
account maintains a $0 balance.  Upon a request from ADP, LDK Solar USA, Inc. transfers sufficient funds from its
checking account into the payroll account in order to process direct deposits for Employees.

[11] Because most of the Debtors' Employees are paid in arrears, as of the Petition Date, some of the Debtors'
Employees have not been paid all of their prepetition wages.

related expenses, and are incurred on the Debtors' behalf.[12] As of the Petition Date, the Debtors do not believe they owe any Reimbursable Expenses to the Employees.

    **c.**  ***Prepetition Withholdings.***  The Debtors are required by law to withhold from an Employee's wages amounts related to, among other things, federal, state and local income taxes, and social security and Medicare taxes (collectively, the "<u>Withheld Amounts</u>") for remittance to the appropriate federal, state or local taxing authorities.  The Debtors must then match from their own funds for social security and Medicare taxes and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "<u>Employer Payroll Taxes</u>," and together with the Withheld Amounts, the "<u>Payroll Taxes</u>").  The Debtors' current monthly obligations on account of Payroll Taxes total approximately US $21,000, which are deposited each month into LDK Solar USA's designated Payroll Account.[13]  As of the Petition Date, the Debtors estimate that the amount of accrued and outstanding prepetition obligations with respect to the Payroll Taxes is approximately US $3,950.00.

    **d.**  ***Prepetition Deductions.***  During each pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, as applicable and without limitation, pre-tax deductions payable to certain of the Specified Employee Benefits (as defined below), such as health care benefits and 401(k) contributions (collectively, the "<u>Deductions</u>") and forward these amounts to various third-party recipients. As of the Petition Date, the Debtors estimate that the amount of accrued and outstanding Deductions was approximately US $1,610.00.

    45.    By the Wages Motion, the Debtors request the authority, but not direction, to (i) pay all Unpaid Wages to their Employees in the ordinary course of business, subject to the Cap,[14] (ii) pay all unpaid Reimbursable Expenses that accrued prepetition or relate to the prepetition period; (iii) honor and process the prepetition obligations with respect to the Payroll Taxes; and (iv) continue to honor and process obligations with respect to the Deductions on a

---

[12] Reimbursable Expenses are incurred by Employees on behalf of the Debtors through use of personal funds or credit cards.  After submission and approval of expense reports, such Employees are reimbursed through checks issued from the LDK Solar USA's Primary Checking Account.

[13] The Debtors' Payroll Taxes are generally processed by ADP and forwarded to the appropriate federal, state, or local taxing authorities at the same time Employee payroll checks are administered.

[14] The Debtors are confident that no Employee should be paid more than $12,475 for such Unpaid Wages.

01:16164366.1

postpetition basis and to forward any prepetition Deductions to the applicable third-party

recipients as was routinely done prior to the Petition Date.

### Prepetition Employee Benefits

46.     The Debtors provide their Employees, directly or indirectly, and in the

ordinary course of business, with a number of employee benefits, including, but not limited to (a)

health care programs; (b) employee saving plans; (c) vacation, sick, holiday and leave benefits;

(d)  life insurance benefits; and (e) certain additional benefits (collectively, the "Specified

Employee Benefits").  Specifically, the Debtors provide the following benefits to their

Employees:

    **a.** ***Health Care Programs.***  The Debtors offer programs to the Employees for medical, dental, and vision care coverage (the "Health Care Program").  The Health Care Program is administered by Anthem Blue Cross, the trade name of Blue Cross of California ("Blue Cross").  The Debtors pay 100% of the premiums for participating Employees and 50% for participating Employee's family members.  Employees' contributions are deducted from Employees' paychecks.[15]  On average, the Debtors pay approximately US $3,491.00 per month for the Health Care Program, of which approximately US $686.68 is contributed by the Employees on account of family members.  The Debtors' average monthly administrative fees for the Health Care Programs total approximately US $111.97 per month.  As of the Petition Date, the Debtors had paid all premiums for the Health Plan through November 1, 2014.[16]

    **b.** ***Vacation, Sick, Holiday, and Leave Benefits.***  The Debtors provide for flexible paid time-off  to their Employees to use for vacation or sick leave (the "PTO Time").[17]  In addition, t**h**e Debtors also provide paid holidays

---

[15] The Health Care Program generally consists of (i) medical coverage provided through the PPO plan administered by Blue Cross; (ii) a dental plan administered by Blue Cross, and (iii) a vision plan administered by Blue Cross.

[16] If an Employee chooses to opt out of the Health Care Program, the Debtors offer a reimbursement of $500 per month, which is paid on the Pay Date in connection with the normal Wages.  Currently, two (2) Employees have elected to receive the $500 per month payment.

[17] Generally, Employees are provided fifteen (15) days of PTO time per year on an accrual basis during their first year of employment.  Thereafter, Employees gain an additional one (1) day of PTO Time for each year of additional employment.  When used, Employees are generally paid for PTO Time at their regular salaried rates.  In the event an Employee has not used all available PTO Time by the end of the fiscal year, the Employee will carry over the balance of any remaining PTO Time to the following year, provided that the total number of accrued and unused PTO Time does not exceed twenty (20) days.

01:16164366.1

for all Employees ("Holiday Pay"),[18] and additional leave policies on a case-by-case basis to their employees based on need for up to five (5) days per year (the "Additional Leave Policies" and, together with the PTO Time and Holiday Pay, the "Leave Pay"). The annual cost to the Debtors for Leave Pay is approximately US $15,825,[19] and, with the exception of accrued but unused PTO programs, the cost of the Leave Pay programs are included in the Debtors' gross payroll.  Accordingly, with the exception of amounts owing in connection with accrued but unused vacation time, all prepetition amounts related to the Leave Pay should be included in the "Unpaid Wages" total set forth above.

c.   **Employee Savings Plans**.  Prior to the Petition Date, and in the ordinary course of business, the Debtors maintained one 401(k) plan for the benefit of their Employees (the "401(k) Plan"), which is administered by ADP.[20] The Employees' contributions to the 401(k) Plan total approximately US $4,809.32 per month.  In addition, the Debtors provide a matching policy, whereby the Debtors will match 100% of the first 4% of an Employee's contribution to the 401(k) Plan. No matching contributions have accrued prior to the Petition Date.

d.   **Severance Plan**.  The Debtors provide a severance plan (the "Severance Plan") applicable to all full-time Employees in the event their employment is terminated by the Debtors other than for cause or the employee voluntarily terminates his or her employment for "good reason" as provided in the Employees' employment agreements.  Under the Severance Plan, the Employee receives a severance benefit equal to the rate of the Employee's base salary as of termination for a period of three (3) months to be paid periodically in accordance with the Company's normal payroll policies.  The Severance Plan also applies in the event of the Employee's death or disability.  As of the Petition Date, there are no Employees receiving Severance Pay under the Severance Plan.

---

[18] Employees are entitled to ten (10) paid holidays per calendar year.

[19] This figure is based on each Employee taking an average of five (5) PTO days per year.

[20] Employees with at least six (6) months of employment are eligible to participate in the 401(k) Plan.  The 401(k) Plan generally provides for pre-tax salary deductions of eligible compensation, which amounts are generally deducted automatically from each participating Employee's paycheck.  Three of the Employees currently participate in the 401(k) Plan.  Participating Employees may elect to contribute pre-tax from 1.0% to 80% of their compensation up to the amounts specified under the Internal Revenue Code ("IRC").  Generally, administrative fees are paid directly by the Debtors to ADP.

e. ***Additional Employee Benefits.*** The Debtors also provide some or all Employees with (i) company-paid term life insurance ("Life Insurance")[21] which costs the Debtors approximately US $96 per month; and (ii) a company automobile (the "Company Automobile") to assist LDK Solar USA's Chief Financial Officer and Board Director, Jack Lai, in performing his duties in support of the Debtors' businesses, which costs the Debtors approximately US $970.27 per month.[22]

47.    By the Wages Motion, the Debtors also seek authority, but not direction, to continue to provide the Specified Employee Benefits in the ordinary course of business and continue to honor obligations under such Specified Employee Benefits post-petition, including any Severance obligations that may come due postpetition with respect to any Employees terminated during these Chapter 11 Cases (the "Certain Severance Obligations"). A hearing with respect to the relief requested in connection with the Severance Plan shall be held on the date and at the time set forth in the proposed order attached to the Wages Motion as Exhibit A (the "Proposed Wage Order"), and parties shall be given an opportunity to object as set forth in the Proposed Wage Order. A proposed order with respect to the relief requested in connection with the Severance Plan is attached to the Wages Motion as Exhibit B.

48.    By the Wages Motion, the Debtors request authority to honor the Severance obligations that may come due postpetition with respect to any Employees terminated during these Chapter 11 Cases (the "Certain Severance Obligations").

### Workers' Compensation Program

49.    It is my understanding that, under the laws of California, , the Debtors are required to maintain workers' compensation policies and programs to provide Employees with compensation for injuries arising from or related to their employment with the Debtors. The

---

[21] Coverage under the Life Insurance entitles the Employee's beneficiary to receive an amount equal to $25,000 per employee. As of the Petition Date, the Debtors believe that all amounts due for Life Insurance under the Health Program have been paid.

[22] The Debtors estimate that an aggregate of $25,000 remains unpaid to Chase Auto Finance as of the Petition Date on account of the Company Automobile.

Debtors maintain a workers compensation insurance policy (the "Workers' Compensation Policy") for all Employees with Farmers Insurance Exchange ("Farmers").  Under the terms of the Workers' Compensation Policy, the policy limits are US $1,000,000 per accident and US $1,000,000 per employee.  As of the Petition Date, there are no workers' compensation claims pending against the Debtors.[23]

50.     Because the Workers' Compensation Policy is essential to the continued operation of the Debtors' businesses under the laws of California, the Debtors request authority in the Wages Motion to pay any and all prepetition amounts which may become due with respect to the Workers' Compensation Policy.  The Debtors further seek authority to maintain and continue their prepetition practices with respect to the Workers' Compensation Policy, including, among other things, maintaining insurance coverage and allowing workers' compensation claimants, to the extent they hold valid claims, to proceed with their claims under the Workers' Compensation Policy.

### Payments to Third Parties Incident to the Payments and Contributions

51.     The Debtors request authority to pay all costs incident to, among other items, the Employee Wages and Benefits, Unpaid Wages, Reimbursable Expenses, and the Payroll Taxes and Deductions, including other processing costs or administration costs ("Processing Costs").  The Debtors estimate that the aggregate amount of Processing Costs accrued but unpaid as of the Petition Date, including those costs referenced in specific sections above, is a *de minimis* amount (i.e., less than US $5,000).  Payment of the Processing Costs is justified because the failure to pay any such amounts might disrupt the operation of third-party

---

[23] The Debtors pay $3,374 annually for premiums and claims administration to Farmers under the Workers' Compensation Policy.[23]  The Debtors renewed the Workers' Compensation Policy in April 2014 for coverage through June 25, 2015, and, therefore, no amounts under the Workers' Compensation Policy were due as of the Petition Date.

providers with respect to the services provided to Debtors.

52.     To implement all of the foregoing relief, the Debtors request that all applicable banks and financial institutions be authorized to receive, process, honor and pay any and all checks and transfers drawn on the Debtors' Payroll Account, whether such checks were presented before, or are presented after, the Petition Date.

**C.  *Motion of the Debtors for Entry of an Order Directing Joint Administration of Their Related Chapter 11 Cases* (the "<u>Joint Administration Motion</u>")**

53.     In the Joint Administration Motion, the Debtors request entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b).  I believe that joint administration of these Chapter 11 Cases will ease the administrative burden for the Court and the parties.  I understand that many, if not all, of the motions, applications and other pleadings filed during these Chapter 11 Cases will relate to the relief sought jointly by all of the Debtors.  In addition, I believe that joint administration will reduce fees and costs by eliminating duplicative filings and objections.  I understand that joint administration will allow the Office of the United States Trustee for the District of Delaware and all parties in interest to more easily and efficiently monitor these Chapter 11 Cases.

54.     I believe joint administration will not adversely affect the Debtors' creditors because the Joint Administration Motion requests only procedural, and not substantive, consolidation of the Debtors' related Chapter 11 Cases.  I understand that parties in interest will benefit from the cost savings associated with the joint administration of these Chapter 11 Cases. Accordingly, I believe that joint administration of these Chapter 11 Cases is in the best interests of the Debtors' estates, their creditors and all other parties in interest.

01:16164366.1

**D.  *Application of the Debtors for Entry of an Order Appointing Epiq Bankruptcy Solutions, LLC as Claims and Noticing Agent Pursuant to 28 U.S.C. § 156(c), § 105(a) of the Bankruptcy Code, Bankruptcy Rule 2002(f) and Local Rule 2002-1(f)* (the "<u>Claims and Noticing Agent Motion</u>")**

55.     In the Claims and Noticing Agent Motion, the Debtors seek to retain Epiq Bankruptcy Solutions, LLC ("<u>Epiq</u>") as their claims and noticing agent in these Chapter 11 Cases.  I believe that by retaining Epiq in these Chapter 11 Cases, the Debtors' estates and their creditors will benefit from Epiq's service.  I understand that, since its inception in 1988, Epiq has provided claims and noticing services in numerous chapter 11 cases in this District.  Consequently, I understand that Epiq has developed efficient and cost-effective methods in its area of expertise.  I also understand that Epiq is equipped to handle the necessary mailings involved in properly sending the required notices to creditors and other interested parties in these Chapter 11 Cases and, therefore, I believe that the Claims and Noticing Agent Motion should be approved.

*Signature Page Follows*

01:16164366.1

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.


Dated: October 21, 2014                    LDK SOLAR SYSTEMS, INC.


                                           */s/ Jack Lai*
                                           _____
                                           Name:  Jack Lai
                                           Title:  President, Treasurer and Secretary

                                           - and -

                                           LDK SOLAR USA, INC.


                                           */s/ Jack Lai*
                                           _____
                                           Name:  Jack Lai
                                           Title:  Chief Financial Officer and Secretary

                                           - and -

                                           LDK SOLAR TECH USA, INC.


                                           */s/ Jack Lai*
                                           _____
                                           Name:  Jack Lai
                                           Title:  Chief Executive Officer, Chief Financial Officer
                                                     and Secretary